The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Please be seated, ladies and gentlemen. I hope I can see you all over this mound of grease. We have a very busy morning, but before we get to the official business at hand, we have one of these happy ceremonies where we admit, of course, we'll see what the vote is, whether we admit, when we admit clerks of one of our judges. Judge Lynn has a motion to make. Thank you, Judge Laurie. It's my pleasure to move the admission of three highly qualified members of the bar to our court. I know they are qualified because they are serving as my law clerks with distinction, and they contributed to the work of my chambers and to this court, and I'm pleased to make this motion. And now to the formalities. I move the admissions of Jennifer Suzanne Bresson Bisk, who is a member of the Bar in Good Standing of the Highest Court of Virginia and the District of Columbia, Henry Wong, who is a member of the Bar in Good Standing of the Highest Court of California, and Lindsay McCartney, who is a member of the Bar in Good Standing of the Highest Court of New York. I have knowledge of their credentials and am satisfied they possess the necessary qualifications. Well, Judge Lynn has very high credibility with us. Judge Freeman, do you agree to grant the motion? I heartily endorse this motion. I agree. We will grant the motion, and if you will prepare to take the oath from the clerk of court. Please raise your right hand. We swear affirmatively to report to yourselves as attorneys of this court, uprightly and according to the law, that you will support the Constitution of the United States of America. I do. I do. Congratulations, and welcome to the Bar of the United States Court of Appeals. Welcome to the Bar of the Court. We look forward to seeing you in the future in a different role, and we wish you luck in your future practice. We have five cases this morning, a patent case from the ITC, a patent case from the trade case from the Court of International Trade, a usual varied mix. One of the veterans' cases will not be argued and is being submitted on the briefs. We will hear first our ITC case consisting of expansion and prescale and ATI and ST microelectronics and Qualcomm versus the ITC and Tessera. It's 2009-1460. After we hear that case, we will briefly adjourn for no more than ten minutes and come back and hear the other three cases with a slightly altered panel. So, Mr. Phillips, you may proceed, and before you do, let me just commend appellants for agreeing to have one counsel rather than splitting a short time into multiple pieces. Please proceed. Thank you, Your Honor, and may it please the Court, I do in fact stand here today on behalf of all four of the appellants. I'm going to focus primarily on the infringement question and spend a little bit of time on the indefiniteness issues. Obviously, I'm happy to answer questions on the array of other issues, but it seems to me our time can more profitably be used focusing on these specific questions. The case comes on infringement in a, to my mind, a somewhat unusual posture because the Commission expressly acknowledged that Tessera and its expert, Dr. Kueh, completely failed to prove infringement through the expert analyses that he undertook. His primary, his number one test in comparing the onboard versus the baseline, he failed to take into account the fact that there were changes in the elements, which would of course change the coefficient of thermal expansion, and therefore, he couldn't distinguish which of the, which of the displacements that were measured were caused by internal versus external loads, and in this extraordinarily unusual circumstance where the claim construction requires you to be able to actually distinguish internal versus external loads, which is something nobody can visibly evaluate. You can only simulate. The Commission concluded, and on the basis of the expert evidence, clearly unsupported with, fully supported by substantial evidence, that there was no way that that test could get you home. So then the question is, what do you do with Dr. Kueh's second test? And here he compares onboard versus offboard. The Commission did find that that test supported the allegation. Mr. Friedman, I have a preliminary question. Do you challenge Dr. Kueh's use of this whole technique that is the simulated comparison, not between the claim language and the allegedly infringing products, but with the comparison with the computer simulation? Do you question that method? We don't challenge that method, Judge Friedman, at a sort of fundamental level. We don't make the argument that you can never simulate. You just complain about the way he applied it. Right, and I think it's important to step back and recognize, though, that when you're dealing in a situation where it's pure simulation, and so you don't really have anything that you can hold onto and look at and feel, that the court ought to at least be somewhat more skeptical as it evaluates this. And you would hope, frankly, the Commission would take the same position, but that any trier effect in that circumstance would want to ensure itself that the experts took them through exactly how the simulation was done and that the ultimate conclusion is, in fact, supported by the evidence. And that's the key here, is that the conclusion the Commission reached, that there is, in fact, provable displacement sufficient to relieve stress based on that second test, is simply unsupported by any evidence. That second test is based, as Dr. Kueh expressly states, on a linearity assumption that he flatly says is inaccurate. There is no linearity between what you have on-board going to off-board, where you're trying to compare the internal and the external loads in that situation. It's not additive. If it were, then you could do precisely what he did, which is to make those comparisons and say this is the amount of the totality of the loads, this is the amount that's attributable on-board, and so therefore this is the amount that's attributable off-board, and then you can make some kind of an assessment based on that. But nonetheless, that recognized disparity, if you will, was not felt by the Commission to completely negate the conclusion of infringement drawn from the test results, test two. Right, but I think at the end of the day, Judge Lynn, the problem you've got is that if you categorically deny that linearity is an appropriate assumption, then inherently all of the data that flow from the linearity assumption are, for that reason, inherently flawed. You cannot make the pivotal distinction between what are external loads and what are internal loads when you don't know, given the entirety of the load, which is attributable to which, because you're making an assumption that they are related in an additive way when you recognize that they are not in an additive form. So it seems to me at that point, this is not an area where the Commission's entitled to this. This is an area of very technical, scientific proof. And when their expert says, you know, I made this assumption. Actually, I thought his testimony here was great, because he says, do you believe that the package and the PWPCB are a linear system? This is at 51.260 of the appendix. Generally speaking, they are not linear. Then why are you making this assumption? I wanted to determine what the result would be if I did make this assumption. Well, that's great. And maybe if you're getting paid by the hour, that's a reasonable way to proceed. But if you're trying to prove something, it doesn't prove anything in terms of what evidence you can derive from that if you accept that the linearity assumption is flatly inconsistent with reality. Well, isn't he simply recognizing the fact that there isn't perfect linearity because of the reasons everybody recognizes? But nonetheless, despite that reality, the test results nonetheless are valid. Well, I don't know what that means. I mean, there's no question that you have a set of data that are based on the assumption of linearity. The question is, what can you infer from those data in terms of whether or not these are external versus internal loads? And the answer is, you can't tell because you don't know how much of the total load is external and how much of it's internal. You're assuming that it works in an additive way. It could well be that none of it's due to external loads. It could be that all of it is due to external loads. And more fundamentally, it's probably true that if you're only taking 52 products to represent 1,020 products, that as to some of them it is and as to some of them it's not. And none of that's analyzed by Dr. Kube, which is the first flaw in the way he analyzes it. The second flaw in the way he analyzes it is that even under his approach, he created magnitude data to demonstrate what the displacement would be. And Dr. Sitaraman came back in and said, look, OK, let's assume that that's the right answer, that you can ignore the linearity problem in this case and we'll look at the specific data that exists and see what it says. And Dr. Sitaraman said, well, the problem is that the magnitudes don't show much difference. There's no displacement on board versus off board. And in some instances, the off board is higher than on board, which suggests that the internal loads are greater than the external loads, which is completely inconsistent with the way this is being analyzed. Mr. Phillips, I'd like to ask you about the wires extending downwardly alongside. Some of your clients have argued that their wires extend outwardly rather than downwardly alongside. Right, Judge Warren. And yet you have embodiments, Sarah has embodiments in the specification that do the same. Tell us why there is no infringement with respect to that claim limitation. Well, it's pretty clear that under any kind of plain meaning of downwardly alongside, and if you look at the examples that are put forward in the brief showing you the pictures of them, what you see in the embodiments are all specifically, in fact, wires that go very close to the edge of the chip. And yet when you look at the accused products, they're all traditional bonds, bonding wires, which go up and out. And so the basic argument, which isn't all that complicated, is to say, look, you set out for yourself that it has to be downwardly alongside. You look at our chips, which go out and away, go out, up, and away, whatever that is. That's not downwardly alongside. In order to get there, you have to do enormous damage to the English language. And that's the basic argument there. It seems to me, obviously, quite persuasive in terms of the infringement analysis. The third part of this is, and this is the point where it seems to me the commission has specifically embraced becoming either a physicist or an engineer or something for a day, because it recognized that the magnitude data that had been generated by Q's second test, based on an improper assumption, nevertheless didn't prove what was needed, didn't show the displacement necessary in order to support the conclusion. And at that point, the commission goes in and says, look, magnitude's not the right way to analyze this. You should be looking at each of the component vectors in order to come to that conclusion. There is not a shred of evidence. There is no expert. There is no one who testified as to how you are to disaggregate the magnitude data. Both Q and Sitaraman specifically analyzed this solely in terms of the magnitude. It's the square root of the sum of the squares. And I confess, my math skills are not what I might have hoped they could be at some point. But even I remember that the square root of the sum of the squares is one of those things that cures a whole lot of ills. And when you try to disaggregate the components of it, what you get is first complete sort of voodoo science that the commission substitutes for a real analysis. And more fundamentally, even on its own terms, 14 of the 52 packages demonstrate for each of the vectors, when broken down into their subcomponents, that they are in fact demonstrate that there is more stress on internal than there is external, which again is completely at odds with the ultimate conclusion. And more fundamentally, casts again extraordinary doubt on the linearity assumption at its core. And it seems to me, again, this is a place where we're not talking about the commission making policy. We're not asking the commission to make predictions. We're asking the commission to make a factual finding based in a simulated world and come to a conclusion. And in that context, this seems to me the classic situation where this court in center cut said, when a trier of fact is dealing in an area that is extraordinarily complicated, that it cannot go beyond where the experts will let you go. They cannot disaggregate the data and start over and start to make their own analysis. And when they do, they get it wrong. And what compounds that is when you go from 52 products to 1,040 products, and then you find out that 14 of the 52 couldn't, under even the most extreme and candidly incorrect theory of this case, get you anywhere, then the extrapolation to 1,040 becomes, to my mind, extremely, extremely unjustifiable. Mr. Phillips, I want to ask you again a question about the linearity assumption. The commission found there was no evidentiary support for Judge Essex's conclusion that the linearity assumption is inherently flawed. Is that incorrect? Yes, it is incorrect because Judge, because Dr. Q himself testified that the linearity assumption is wrong. He says it at 33,539. He says it again at 51,260 and 55,194. I mean, he recognizes it's just simply not true. But didn't your own witness testify that the linearity assumption was appropriate? No, what he testified was, I will take Dr. Q at his word, that you can analyze the data along these lines, and I will tell you that if you analyze the data, as he suggests, what you get are magnitude numbers that demonstrate that the internal stress is greater than the significant number of cases, which means that he's wrong. And then he proves it. And he also proves that the prior art, the OMBACS system, that the prior art would be infringing under that interpretation. So all he's doing is challenging the ultimate results that Q comes to based on that methodology. Obviously, to do that, he has to, for those purposes, and solely for those purposes, assume the validity of that approach. First of all, it doesn't remotely represent a concession that the approach is sound. And more fundamentally, it doesn't overcome the fact that Dr. Q himself said, I recognize the linearity assumption is not a valid way to go. He wasn't using this to prove his case. He was simply using this to see if there was better support for the case he thought he had made, incorrectly, with respect to the first test that he had done. He was just trying to reinforce a decision that he had already made independently. It's not a basis for separately analyzing this particular problem. The last thing I want to sort of focus on in this, although I do think there's still another serious issue with the secondary causation, which is the appreciably relieved stress, but I'll leave that part to the brief. But it does seem to me that when you're in a situation where you cannot know whether or not there has been infringement on a particular case, until you get the results from Dr. Q's – assuming he did it right – but from Dr. Q's analysis of what's going on, it seems to me we are at a point where you have stretched the indefiniteness doctrine beyond anything that's recognizable. This is supposed to be – this is supposed to provide notice to those who are trying to build a product. And whatever else this may do, any test that requires an infringement analysis along the internal stresses and which are external stresses to deal with this kind of a compliant layer, it seems to me at the end of the day, Your Honor, you're talking about something that's inherently insoluble. It's ambiguous beyond words. And as a consequence of it, the court not only should find that there is no infringement in this case, but it also ought to find that this is indefinite. It was construed. It was construed. But this court has consistently said that there are two parts to the indefiniteness inquiry, whether it is subject to being construed and then is it in fact subject to being applied in any meaningful way. Are there objective indicators of any sort against which to measure this? And if any case tests that principle, it seems to me it's this one under these particular circumstances. Thank you, Mr. Phillips. We'll give you your three minutes of rebuttal back. Ms. Valentine for the commission. Does the commission use voodoo science? No, Your Honor. May it please the court. I think probably my best use of my time is to respond to Mr. Carter's arguments, unless you have some specific questions for me. The commission did not act as an expert. Rather, the commission based its finding of infringement solely on what was presented in the record after considering the record as a whole. The commission did, though, seem to take sort of some pieces of test one and use it in the analysis of test two. And it seemed to me the commission arguably went beyond what the evidence was to sort of conclude, reach a conclusion based on its own analysis. No, Your Honor. I respectfully disagree. That is not the case. The claim construction in this case requires certain things. It requires that the terminals are capable of being displaced with respect to the chip by external loads and that the displacement caused by external loads appreciably relieves mechanical stress. And Dr. Q's second test, otherwise called the direct loading test, shows exactly that. As he showed in his expert report, he presented evidence showing the improvement in reliability of the accused packages over the corresponding baseline packages only under external loads. And unlike his onboard test, Dr. Q directly applied the external load displacement vector that he calculated by comparing the onboard and offboard displacements of the solder balls to the accused and baseline packages. And this gets directly into one particular point about the linearity assumption. The question is, what was the linearity assumption used for? The linearity assumption was used for one thing, to approximate this external load displacement vector. That is, to approximate what would the displacement at the bottom of the solder ball be under external loads only. It was not used for anything else. And as Dr. Sitaraman testified, by taking the onboard displacement and the offboard displacement and comparing them, the results would be, and is, I quote, somewhat reflective of this external load. And that is the only thing the external load vector indicates. Did the commission conduct its own vector analysis of the data? No, Your Honor. In fact, the commission simply recognized that Dr. Q's, or sorry, the commission simply recognized that Dr. Sitaraman's criticism of Dr. Q's test was unfounded. In particular, it's on page, sorry, Your Honor, on page 33539, I believe it is, of the record. Dr. Q, it's very clear, he gives really nice illustrations of what exactly he did. He takes the accused packages and he determines what the displacement at the bottom of the offboard, so simply due to the internal loads. And then he puts it onboard and sees what that displacement would be due to the internal and external loads. And then he takes the difference. And the difference he takes is of a vector. He does not take the difference of the magnitudes of the vector. He takes the difference of the vector. And vectors have both direction and magnitude. You cannot simply take the difference between two vectors by subtracting their magnitudes. Did the commission ignore his magnitude calculation? Your Honor, the magnitude calculation that Dr. Q performed were actually done in his first test, the rejected onboard test. There, he specifically calculated the magnitudes of the accused package onboard. And he calculated the terminal to chip displacement and compared that with the terminal to chip displacement of the baseline packages onboard. And using those two, he did compare those. But then he also did a second step of determining this plastic work, which is the reliability calculation. So you're saying the commission said that the magnitude determinations from the first test were really not relevant to the second test? Exactly, Your Honor. That's exactly the point. The calculation that was done in the second test was the reliability calculation. That was the comparison that was made, the plastic work calculation of the accused package and the baseline package using this external load vector. There was no direct comparison of magnitude of the onboard package and the offboard package. It's really a meaningless comparison in any case. The question is, what does the package do under this external load vector? And to determine this external load vector, you have to take the difference in the vectors onboard and offboard. What's your response to Mr. Phillips' argument about the linearity assumption? Yes, Your Honor. The linearity assumption was exactly that. It was an assumption to determine this external load displacement vector. But isn't he correct that if that was an assumption, that was a basis for the calculations made to draw the conclusion of infringement? If that assumption is flawed, then everything else falls apart? The commission did not find so, Your Honor. And the reason is, what was this linearity assumption used to find? The linearity assumption was only used to approximate this external load displacement vector. It's to take the difference between the package onboard and the package offboard and to simulate the effects of the PCB, the printed circuit board. What effect would simply that without any sort of internal loads have on the packages? That was the only thing. And the claim construction does not require any sort of quantification of what the external load may be. Ms. Valentine, I want to ask you about this, the wires extending downwardly. Yes, Your Honor. Didn't the commission err at the ALJ when he construed that to mean if the wire is extended up, out, and then downward? That's not what the claim says. Your Honor, the claim, if you particularly, I think the best illustrations of what's going on here are at figures 13 and 14 in the patent. That's at the record at JA 452 and 453. Two things about this, Your Honor. The specification only discloses the use of conventional bonding wires. That's the first point. The second point is there are no illustrations in the patent that specifically disclose the claimed invention. Appellants point to figures, for example, figure 26, but that figure shows leads and flaps, which the specification specifically gives a close proximity requirement to. It says that these leads and flaps must be in close proximity. That is not the case with bonding wires. So why is it appropriate to read into the claim these limitations about up, over, and down? All the ALJ recognized with that, Your Honor, and the commission agreed, is that under the conventional bonding wire process, there may be some play in the way the wires attach from the top of the chip down to the backing element. And all he did was not require any sort of close proximity requirement. Obviously, Your Honor, the wires have to go from the chip downwardly to the backing element. That's undisputed. The question is, does it have to be some sort of close proximity requirement? And unlike where the specification talks about these leads and flaps, there is one particular point in the specification that does talk about the claimed embodiment, and that is on page J8481, column 34. There is no close proximity requirement. It simply says the bonding wires extending downwardly alongside the edge of the chip to the backing element. And that is all the ALJ recognizes. Let me tell you what troubles me about this. I'm sorry. I see my time has run, but I would like to answer your question. Please answer the question. We're dealing here with a highly technical field. Yes, Your Honor. And when we deal with such a field, why shouldn't the claimed language that has been carefully drawn be given a fairly narrow literal interpretation? I mean, this isn't a broad patent covering a method of increasing sunlight or something. You've got all of this thing, most of which is beyond my basic comprehension, but it seems to me when you're dealing with this kind of a subject and you've got highly technical language in the claim, you should have interpreted what it says rather than say, well, what it must have meant was something else. And that is exactly the point, Your Honor. There is no close proximity requirement in the claim itself. If you look on page 41, column 34, which is where this claim is found, it simply says the wires extend downwardly alongside, and it very carefully explains how the wires must attach to the top of the chip and extend downwardly alongside to the backing element. There is no sort of close proximity requirement. There is no – and that is exactly the point that the ALJ found, is that there is no close proximity requirement. Following the claim construction, all that is required is that the binding wire attach from the top of the chip down to the backing element and without any sort of other limitations being read in there. So there was no construction that read into the claim that the wires go up, over, and down. It was just a construction that whatever it means, it doesn't mean close proximity. Exactly, Your Honor. Thank you, Ms. Valentine. Mr. Hattenbach is representing Tessera. Tessera, Your Honor. Thank you. May it please the Court. One of the other reasons that the claim was the downwardly alongside element was construed in the way that Ms. Valentine was describing is that to do otherwise, to adopt the closely alongside construction, would not just be contrary to some of the preferred embodiments. It would actually exclude every single one of the preferred embodiments in the entire patent. And this Court has, of course, cautioned against doing that in the absence of compelling evidence. I want to start by addressing the first statement that was made by counsel this morning, which was that the Commission found that Dr. Q completely failed, were his words, to find infringement. And, of course, that's not correct. There were two independent tests. For ease of reference, we're calling them Test 1 and Test 2, and we're focused on Test 2 here today. And the Commission, of course, analyzed that test in detail and found, for very good reason, that it was an appropriate test. Counsel says that the Court should be skeptical of that test because it was a highly technical analysis. But then, on the other hand, he also acknowledged in his argument that it was the only way to conduct the analysis. And I have trouble reconciling those two statements. If it's the only way of doing something, I think it's inherently appropriate for the expert to have done it that way. If he hadn't done it that way, they'd probably be arguing that he should have done it some other way. With regard to the linearity assumption, as Ms. Valentine said, it's an assumption. And what that means is it's not perfect. And no one ever claimed it was perfect. To the contrary, Tessera's expert, Dr. Q, readily acknowledged it wasn't perfect. It was an assumption. But it was an assumption that he explained was appropriate under the circumstances. It was appropriate not only because the claim construction that everyone agreed to said that a displacement needed to be applied such as the displacement that would exist in use of an actual device subject to thermal forces. Such as doesn't mean exactly. It means an approximation is appropriate. Not every analysis that involves an approximation, of course, is inherently flawed. Yet that's what counsel would have this court conclude. Engineers make approximations all the time. In fact, probably more often than not, engineering depends on approximations. The question is whether the approximations were appropriate under the circumstances. And the testimony is that they were. And let me point you to some of that testimony. Is it appropriate to conclude that there's infringement based on approximations? In this case, it is. And the testimony was, well, actually the genesis of the linearity approximation to begin with was that in other cases, experts, skilled PhDs in the field had said Dr. Q erred because he had to do this linearity approximation. So he said, well, let's see what happens when I do it because everyone says this is the right way to analyze the problem. I'll accept for the sake of argument that it isn't. We'll put him to the test and see what happens. That's what he did. So he began with a series of experts having said this is how he should do the problem, how he should solve the problem, that the linearity assumption is the way to address it. Dr. Sitaraman, the respondent's expert, said that the linearity assumption, the results from that were somewhat reflective of what Dr. Q was looking to determine. And he, in fact, used the linearity assumption in much more depth and detail for much more extensive purposes than Dr. Q ever did. And then it came to Dr. Q's testimony where he said even if a system isn't perfectly linear, he acknowledged there were parts of the system that weren't perfectly linear here, it was still appropriate. It obtained an approximate solution, as he described it, and he also explained that many of the materials in the packages were, in fact, linear. There was no cross-examination of any sort, of any meaningful sort, on any of those points. So they rested, leaving Dr. Q with that testimony and no contrary testimony in the record. And the commission analyzed those facts and concluded, as a matter of fact, and this is a factual issue, regardless of how they try to spin it, that it was inherently logical, and they didn't just leap to that conclusion, but they went through the analysis and came to a reasoned conclusion. The arguments moving on to this internal versus external force, as counsel for the ITC pointed out, that had to do with method one, not method two. And secondarily, it completely obliterated any distinction between displacement on one hand and claimed movement on the other. Claimed movement was the subject of an agreed claim construction that's 49 words long. It means something very different than displacement. And as Tessera explained in his briefing, that when one tries to start swapping those two terms, one for another, anomalous consequences can and will occur. And here the anomalous consequence is, counsel for the appellants was arguing that because there was more magnitude of displacement off-board than on-board, there must have therefore been more stress off-board than on-board, and that that was contrary to what Dr. Q found. Imagine a semiconductor package with little solder balls on it floating in the air. As it's rotated or as it's bent like a frown or a smile, the solder balls on the bottom, if they aren't attached to anything, will simply move along with the bottom of the package, and there won't be any forces applied to them. In contrast, when the package is on-board, and there's something tugging at the other end of those solder balls, as the package smiles or frowns, there will be forces applied to them, and those forces will cause damage to the solder balls, and that damage over repeated cycles will add up in those solder balls and will eventually lead to their failure. And that's what this case is about. The appellants are arguing that the claim is indefinite, and does the fact that the word movement, that it took 49 words to describe what that means, suggest that there's some merit to this argument? Your Honor, it suggests that the parties agreed on a very precise definition, which itself demonstrates that there was no lack of clarity about what the claim meant. The testimony from not just Tessera's experts, but the appellant's own experts, one after the other, it's not just a single one of them, was that they did understand what the claim meant, and in fact... Is the 49 words a reflection of a lack of clarity or a search for clarity? It could be a search for clarity that was successful, Your Honor. There's no question that the search that was conducted by the parties was successful. The reason, actually, for the 49 words is the construction derives from statements that were made during the prosecution history, and we wanted to track those statements verbatim, and that's what we did. But at the end of the day, we have a situation here where not only was there a construction, which under some of this court's recent jurisprudence has been held to mean the claims are definite, but there was a construction that both parties agreed on. Both parties applied expert after expert after expert. When one of the respondent's experts was asked, would a person of ordinary skill in the art having read this patent understand what's within and outside the scope of the claims, he said, yes, I believe they would, and had I been asking the questions, I probably would have stopped there, but the lawyer asking him said, yes, one more. He said, you have no doubt about that? And the expert for the respondent said, no doubt. That's the antithesis of a showing of insoluble ambiguity by clear and convincing evidence. What counsel was arguing really was, at the end of the day here, the task of applying this finite element analysis is very difficult, but that's something to which this court has spoken again and again in the cases, and I'll point the court to the Exxon case. When addressing indefiniteness, the question isn't whether it's difficult. The question is whether it's impossible, and the court in Exxon said, in fact, no matter how difficult the task may be, if the claim can be construed and applied, the claim is definite. That's Exxon 265 F3D at 1375. We know the Exxon case, Mr. Hattenbeck. Any final thought? I will leave it at that, Your Honor, and I appreciate the time. Good. Thank you very much. Mr. Phillips has three minutes of rebuttal. Thank you, Your Honor. I will try to be brief. Counsel suggested a minute ago that somehow there's some irrelevance between internal versus external, and then said that you have to be careful about how you interpret movement versus displacement, but the difficulty here, obviously, is that the word movement is being construed, and this 49-word construction includes the word displacement, which is why we're examining displacement. So the suggestion that somehow we're looking at the wrong subject matter or that there's some kind of mix-and-match problem here seems to me demonstrably absurd. What is absolutely clear is that the Q approach was rejected by the commission specifically, both the first approach and the second approach, and in order to get to the whole, which the commission recognized, the whole in this case, what the commission did was it disaggregated the magnitude data and started to look at it on a vector component basis, and it did that without the benefit of any expert support in its analysis, and when you take the combination of a linearity assumption that doesn't allow you to, you know, the notion that you're just trying to approximate, I mean, the truth is you're not trying to approximate. This is not a situation where you're an engineer trying to figure out whether or not you think a product's going to be better if you develop it in a particular way. We're talking about infringement. We are talking about stopping products from coming across the border. That's not a situation where you sit there and say, well, you know, it's close enough for government work. That's a situation where the obligation on the other side is to prove that there's infringement, and Q didn't do that with anything he did, and the commission was required to go to Siddharaman's internal data in order to try to make up for that missing link, and at the end of the day, this court's already said that's not an appropriate way to go. With the downwardly problem there, again, the purpose of it alongside is the basis. I mean, that's the specific language, and so you can, if you want to, if you're going to do anything, you're going to have to incorporate into alongside something that's designed specifically to move it down, and then with respect to indefiniteness, counsel, you know, ended his conclusion. It was an interesting comment. He said whether it can be as construed and as applied, and that's the critical component here because the reality is there is no way to apply this patent. If you are outside trying to figure out how to build one of these structures and reach any kind of a conclusion, this is inherently indefinite, and the court should so declare it. If there are no questions, I'd ask the court to reverse. Thank you, Mr. Phillips. We will take the case under advisement. It's well argued. Court will adjourn for a few moments. Thank you, Your Honor. The honorable court will take a short recess. Nice first time. Thank you. Well done. Thank you.